IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-464

Filed: 3 November 2015

Cleveland County, No. 12 CVS 41

THOMAS JEFFERSON CLASSICAL ACADEMY CHARTER SCHOOL, PIEDMONT COMMUNITY CHARTER SCHOOL, AND LINCOLN CHARTER SCHOOL, Plaintiffs,

v.

CLEVELAND COUNTY BOARD OF EDUCATION, D/B/A CLEVELAND COUNTY SCHOOLS, Defendant.

Appeal by defendant from judgment entered 29 January 2015 by Judge Jesse B. Caldwell, III in Cleveland County Superior Court. Heard in the Court of Appeals 8 October 2015.

*Robinson Bradshaw & Hinson, P.A., by Richard A. Vinroot, Matthew F. Tilley and Amanda R. Pickens, for plaintiffs-appellees.*

*Tharrington Smith, L.L.P., by Deborah R. Stagner, for defendant-appellant.*

*Christine T. Scheef and Allison B. Schafer, for amicus curiae North Carolina School Boards Association.*

TYSON, Judge.

Defendant Cleveland County Board of Education, d/b/a Cleveland County Schools ("CCS" or "Defendant"), appeals from judgment entered in favor of Thomas Jefferson Classical Academy Charter School, Piedmont Charter School, and Lincoln Charter School (collectively, "the charter schools" or "Plaintiffs") in the amount of

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

$54,527.80.  The trial court concluded CCS had underfunded Plaintiffs during the 2009-10 fiscal year.  We affirm.

## I. Factual and Procedural Background

This case returns to this Court after prior remand to the trial court by a divided panel of this Court. *See Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cnty. Bd. Of Educ. (Thomas Jefferson II)*, __ N.C. __, 763 S.E.2d 288 (2014).

Plaintiffs commenced this action on 9 January 2012 by filing a complaint, in which they alleged CCS had underfunded the charter schools for fiscal year 2009-10. Plaintiffs asserted CCS failed to pay them the statutorily required per-pupil amount of all money contained in the local current expense fund.  Plaintiffs alleged CCS owed them approximately $102,480.00

Plaintiffs asserted CCS wrongfully transferred approximately $4.9 million from the local current expense fund into a "special revenue fund" known as Fund 8. Monies in the local current expense fund must be shared with charter schools, while monies in a special revenue fund are not required to be shared with the charter schools.

Plaintiffs sought a declaratory judgment that CCS was statutorily required to allocate the funds in accordance with N.C. Gen. Stat. § 115C-238.29H (2009), and demanded recovery in the amount of $102,480.00 and attorneys' fees.  CCS timely

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

served an answer, and denied the transfer of funds to the special revenue fund violated any relevant statutory provisions.

A non-jury trial was held on 9 October 2012. On 21 February 2013, the trial court entered a final judgment in favor of Plaintiffs and awarded the charter schools $57,836.00. Plaintiffs were also awarded attorneys' fees by separate order. CCS appealed both orders.

In an opinion issued 2 September 2014, this Court reversed the trial court's order awarding attorneys' fees to Plaintiffs. This Court held "the determination of whether funds that accrued to the local school administrative unit were 'restricted' is a conclusion of law rather than a finding of fact." *Thomas Jefferson II*, __ N.C. at __, 763 S.E.2d at 293.

This Court remanded the case to the trial court for "a revised judgment with appropriate findings of fact and conclusions of law as to the funds at issue." *Id.* at __, 763 S.E.2d at 295. This Court instructed the trial court that "[r]elevant findings of fact would concern the origin, purpose, and ultimate use of the funds, not their designation as 'restricted.'" *Id.* at __, 763 S.E.2d at 293.

The hearing after remand was held on 21 November 2014. The trial court entered a final judgment on 29 January 2015 in favor of the charter schools and awarded them $54,527.80, which represented their "per-pupil share of those moneys CCS had included in its Special Revenue Fund that were not, in fact, restricted."

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Defendant gave timely notice of appeal to this Court.

## II. Issue

Defendants argue the trial court erred by finding and concluding certain revenues were not restricted, and the charter schools were therefore entitled to a *pro rata* share of those revenues pursuant to N.C. Gen. Stat. § 115C-238.29H(b) (2009).

## III. Standard of Review

"When the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." *Jackson v. Culbreth*, 199 N.C. App. 531, 537, 681 S.E.2d 813, 817 (2009) (citation and quotation marks omitted). "Evidence must support the findings, the findings must support the conclusions of law, and the conclusions of law must support the ensuing judgment." *Id.* (citation omitted).

"The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary." *Curran v. Barefoot*, 183 N.C. App. 331, 335, 645 S.E.2d 187, 190 (2007) (citation omitted). "The trial court's conclusions of law drawn from the findings of fact are reviewable *de novo*." *Id.*

## IV. Analysis

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Former N.C. Gen. Stat. § 115C-238.29H governed the allocation of funds between local school administrative units and charter schools during the 2009-10 school year, which is the relevant time frame in this appeal. N.C. Gen. Stat. § 115C-238.29H (2009). N.C. Gen. Stat. § 115C-238.29H(b) required the local school administrative unit to "transfer to the charter school an amount equal to the per pupil local current expense appropriation to the local school administrative unit for the fiscal year" for each student who attends a public charter school. N.C. Gen. Stat. § 115C-238.29H(b).

This Court held the phrase "local current expense appropriation" is "synonymous with the phrase 'local current expense fund' in the School Budget and Fiscal Control Act, N.C.G.S. § 115C-426(e)." *Francine Delany New School for Children, Inc. v. Asheville City Bd. of Educ.*, 150 N.C. App. 338, 347, 563 S.E.2d 92, 98 (2002), *disc. review denied*, 356 N.C. 670, 577 S.E.2d 117 (2003). N.C. Gen. Stat. § 115C-426(e) defines "local current expense fund" as:

> The local current expense fund shall include appropriations sufficient, when added to appropriations from the State Public School Fund, for the current operating expense of the public school system in conformity with the educational goals and policies of the State and the local board of education, within the financial resources and consistent with the fiscal policies of the board of county commissioners. These appropriations shall be funded by revenues accruing to the local school administrative unit by virtue of Article IX, Sec. 7 of the Constitution, moneys made available to the local school administrative unit by

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

> the board of county commissioners, supplemental taxes levied by or on behalf of the local school administrative unit pursuant to a local act or G.S. 115C-501 to 115C-511, State money disbursed directly to the local school administrative unit, and other moneys made available or accruing to the local school administrative unit for the current operating expenses of the public school system.

N.C. Gen. Stat. § 115C-426(e) (2009). *See* N.C. Const. art. IX, § 7(a) ("[A]ll moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State . . . shall be faithfully appropriated and used exclusively for maintaining free public schools."); *Francine Delaney*, 150 N.C. App. at 339, 563 S.E.2d at 93.

The applicable 2009 version of N.C. Gen. Stat. § 115C-426(c) permitted the creation of "other funds . . . to account for trust funds, federal grants restricted as to use, and special programs." This Court interpreted this statutory provision in two related cases.

In *Sugar Creek Charter School, Inc. v. Charlotte-Mecklenburg Bd. of Educ. (Sugar Creek I)*, this Court held county appropriations specifically earmarked for two particular programs were subject to the mandatory provisions of N.C. Gen. Stat § 115C-238.29H(b). 188 N.C. App. 454, 460, 655 S.E.2d 850, 854, *disc. review denied*, __ N.C. __, 667 S.E.2d 460 (2008). This Court's decision emphasized the fact that the school board had failed to set up a "separate special fund" for these programs, and

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

placed the appropriations in the school board's local current expense fund. *Id.* at 460-463, 655 S.E.2d at 855-56.

This holding was expanded in *Sugar Creek Charter School, Inc. v. Charlotte-Mecklenburg Bd. of Educ. (Sugar Creek II)*, 195 N.C. App. 348, 360-61, 673 S.E.2d 667, 676, *appeal dismissed and disc. review denied*, 363 N.C. 663, 687 S.E.2d 296 (2009). In *Sugar Creek II*, this Court concluded several sources of revenue with either a designated purpose or for a special program were subject to the per-pupil distribution, because the funds were placed in the local current expense fund, as opposed to a separate fund. This Court reiterated its prior holding in *Sugar Creek I* that "[b]ecause Defendants have held these moneys in their local current expense fund, they are required to share these moneys with Plaintiffs." *Sugar Creek II*, 195 N.C. App. at 361-62, 673 S.E.2d at 676 (citation omitted).

Based on *Sugar Creek I* and *II*, this Court held "the provisions of Chapter 115C . . . do not require that all monies provided to the local administrative unit be placed into the 'local current expense fund[.]'" *Thomas Jefferson Classical Acad. Charter Sch. v. Rutherford Cnty. Bd. of Educ. (Thomas Jefferson I)*, 215 N.C. App. 530, 543, 715 S.E.2d 625, 633 (2011), *disc. review denied and appeal dismissed*, __ N.C. __, 724 S.E.2d 531 (2012). "Rather, *Sugar Creek I* and *II* clearly indicate that it is incumbent upon the local administrative unit to place restricted funds into a separate fund." *Id.* at 544-45, 715 S.E.2d at 634. This Court further stated "[i]f the funds are left in the

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

'local current expense fund,' then they are to be considered in computing the per pupil amount to be allocated to the charter school." *Id.* at 545, 715 S.E.2d at 634.

While these prior cases clearly indicate local school boards are permitted to place certain restricted funds in a separate fund, so as to not require their inclusion in the charter schools' *pro rata* share, "restricted funds" were not defined until this Court's recent decision in *Thomas Jefferson II*. *Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 292 (noting "we have never defined what 'restricted funds' are or who has the authority to make that determination.").

In *Thomas Jefferson II*, this Court relied on our prior holdings in *Sugar Creek I and II*, and *Thomas Jefferson I*, and concluded "the local school administrative unit may deposit any 'restricted' funds into a fund separate from the current expense fund." *Id.* (citations omitted). This Court set forth the proper legal framework under which to analyze "restricted" funds:

> We further conclude that the determination of which funds may be placed in a separate fund is a question of law and not solely in the discretion of the local school board, given the mandatory language found in the budget statute [N.C. Gen. Stat. § 115C-426(e)]. . . .
>
> Because the issue of whether funds are "restricted" or not is an issue of law, we further hold that the determination of whether funds that accrued to the local school administrative unit were "restricted" is a conclusion of law rather than a finding of fact. . . . Relevant findings of fact would concern the origin, purpose, and ultimate use of the funds, not their designation as "restricted."

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

*Id.* at __, 763 S.E.2d at 293 (citation omitted).

This Court continued by noting "'[r]estricted' is not a term found in any of the relevant statutes," but is "the Court's shorthand for those monies that can be placed in a separate fund, i.e. those from 'trust funds, federal grants restricted as to use, and special programs' which must be accounted for separately." *Id.* (quoting N.C. Gen. Stat. § 115C-426(c)).

This Court explained in order to determine which funds were "restricted," "the question is . . . whether the funds have a limited use and specific purpose, such as to fund a special program." *Id.* (citation omitted). By contrast, "unrestricted funds are those that could be used for *all* of the K-12 population *without restriction.*" *Id.* (emphasis in original). We held "[b]ased on the prior cases and the language of the applicable statutes, we define 'restricted' funds as *those funds which have been designated by the donor for some specific program or purpose, rather than for the general K-12 population of the local school system.*" *Id.* (emphasis supplied).

Defendant argues the trial court erred by finding various sources of revenue were not restricted, and concluding these funds are subject to a per-pupil distribution to the public charter schools. The following sources of revenue are specifically at issue: (1) tuition/fees; (2) indirect costs; (3) Medicaid reimbursement; (4) E-Rate; (5)

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Juvenile Crime Prevention Council; (6) Dropout Prevention Grant; (7) ROTC; (8) WorkForce Investment Act; and (9) Gear Up Grant. We address each one in turn.

A. Tuition/Fees

Defendant argues the trial court erred by finding the funds labeled "Tuition/Fees" were not restricted, and therefore subject to per-pupil distribution to the charter schools. We disagree.

The trial court made the following finding of fact regarding the origin, purpose, and use of the tuition/fees funds:

> 15.    CCS included moneys designated as "Tuition" and "Tuition/Fees" in its Special Revenue Fund during fiscal year 2009-10. This money consisted of the payment of tuition and fees CCS received from parents of students residing outside of Cleveland County. CCS receives tuition and fees to educate its students, including out-of-district students, and these funds are used for CCS's general operating expenses and its general K-12 educational program. The parents that pay tuition and fees to CCS place no restriction on CCS's use of those funds.

The trial court concluded as a matter of law that the money listed as "tuition" and "tuition/fees" were not restricted based on this finding of fact.

CCS argues the money listed as "tuition/fees" was restricted because the money was "paid to the Board by the Rutherford County Board of Education to provide a teacher assistant for a single, specific special education student who resided in Rutherford County but attended CCS." CCS contends this money differs from the

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

money listed as "tuition," which was paid directly from parents. CCS asserts the trial court failed to make findings of fact with respect to the origin, purpose, and use of the "tuition/fees" funds.

David Lee ("Mr. Lee"), the chief financial officer for CCS, was asked at trial whether he had stated in his deposition that the local source money, including money for tuition/fees, was not restricted. He responded in the affirmative. Dr. Nellie Aspel ("Dr. Aspel"), the director of exceptional children for CCS, testified CCS "sign[ed] an annual contract and then we hire the teacher assistant. And then each month we invoice Rutherford County for that month's portion of that TA pay." The Individuals with Disabilities Act requires CCS to provide such services to students with disabilities in accordance with their individualized education plans ("IEPs"). *See* 20 U.S.C. § 1400, *et seq.* Regardless of whether CCS receives reimbursement for this particular student from Rutherford County, providing these services is part of CCS's general operating costs.

We have reviewed the evidence of record and the transcript, and fail to see a significant distinction between the money paid to CCS by Rutherford County Schools, and tuition paid by parents of CCS students residing in Cleveland County. Both sources of tuition funds were used for CCS's general operating expenses and its general K-12 population.

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Competent evidence supports the trial court's findings of fact regarding the tuition/fees funds. These findings of fact support the trial court's conclusion of law that this money was not restricted based on origin, purpose, or use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

## B. Indirect Costs

Defendant argues the trial court erred by finding the funds labeled "indirect costs" were not restricted and subject to the statutory per-pupil distribution to the charter schools. We disagree.

The trial court made the following finding of fact with regard to indirect costs:

> 19. CCS included moneys designated as "Indirect Cost Allocated" in its Special Revenue Fund during fiscal year 2009-10. This money consisted of reimbursements from the federal government for a portion of CCS's "general overhead" expenses, which CCS received in connection with its operation of federal programs. CCS refers to these expenses as "indirect costs." As CCS acknowledges, indirect costs are not attributable to any particular program within CCS, and include various general operating expenses, such as accounting, payroll, purchasing, facilities management, and utilities. The federal government does not place any restriction on how CCS uses the reimbursements it receives for indirect costs.

Testimony at trial tended to show the origin, purpose, and use of the funds for indirect costs. Mr. Lee testified the federal government placed no restrictions on the portion of the federal grants CCS received in relation to indirect costs and operating expenses. Mr. Lee stated the money received from federal grant funds for indirect

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

costs are spent in the normal operations of the school district, and are not spent for any restricted programs or expenses.

Although indirect costs may be connected to federal grant money for a particular program, this fact does not *per se* make these funds restricted. In *Thomas Jefferson II*, this Court stated "the question is . . . whether the funds have a limited use and specific purpose, such as to fund a specific program." *Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293 (citation omitted).

Mr. Lee further testified the indirect cost money is "plain money that goes in [the] current expense fund" and was "spent for current operating expenses." Mr. Lee explained no one required him to deposit the money into a separate fund, and he did so on his own volition. Mr. Lee's testimony supports the trial court's findings of fact that these funds "consisted of reimbursements," because they were part of the federal grant reimbursement money CCS received. Mr. Lee's testimony also supports the trial court's finding of fact that the funds were not "designated by the donor for some specific program or purpose[.]" *Thomas Jefferson II*, ___ N.C. App. at ___, 763 S.E.2d at 293.

The trial court's findings of fact regarding funds labeled "indirect costs" are supported by competent evidence. Any evidence to the contrary does not change our analysis regarding the classification of these funds. Under the applicable standard of review, it is for the trial court to "pass[] upon the credibility of the witnesses and

- 13 -

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

the weight to be given their testimony and the reasonable inferences to be drawn therefrom." *Knutton v. Cofield*, 273 N.C. 355, 359, 160 S.E.2d 29, 33 (1968). "The trial court must . . . determine what pertinent facts are actually established by the evidence before it, and it is not for an appellate court to determine *de novo* the weight and credibility to be given to evidence disclosed by the record on appeal." *Coble v. Coble*, 300 N.C. 708, 712-13, 268 S.E.2d 185, 189 (1980) (citations omitted).

The trial court's findings of fact support its conclusion that these funds were not restricted based on their origin, purpose, and use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. The trial court did not err by finding these funds should have been included in the local current expense account and apportioned to the charter schools on a per-pupil basis. This argument is overruled.

### C. Medicaid Reimbursement

Defendant argues the trial court erred by concluding the Medicaid reimbursement funds were not restricted. We disagree.

The trial court made the following finding of fact regarding the Medicaid reimbursement funds:

> 27. CCS used moneys designated in its audit as "Medicaid Reimbursement" for its general operating expenses during its 2009-10 fiscal year. CCS received these reimbursements for services CCS provided for students with individual education plans ("IEP's"), *i.e.*, in accordance with federal law, which requires both CCS and the Charter Schools to provide such services to students

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

> with learning disabilities. The evidence shows that CCS used other moneys from its general funds to operate its IEP programs as well, and that the federal government does not restrict the use of the reimbursement funds once received by CCS.

Testimony regarding the origin, purpose, and use of the Medicaid reimbursement funds tended to show the following: Dr. Aspel stated she was responsible for Medicaid billing for direct services. Dr. Aspel explained students with special needs are given an IEP. An IEP is an outline of special education or specialized instruction-related services students with disabilities will receive throughout the school year. These students are part of the general K-12 population enrolled throughout CCS and the charter schools.

Dr. Aspel testified CCS, as the local education agency ("LEA"), provides services to any disabled students according to the student's IEP. The federal government subsequently reimburses the LEA for "what [they have] already delivered." Mr. Lee also admitted the $162,098.00 CCS received as "Medicaid Reimbursement" was not restricted.

Dr. Aspel explained "[t]he Medicaid [reimbursements] go back into the exceptional children's budget to help offset the cost of the employment of the physical therapist, occupational therapist, speech therapist, and all the specialized equipment that they need to deliver the services that are on the IEP." As discussed *supra*, federal law requires both CCS *and* the charter schools to provide these services to students

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

with disabilities *regardless* of whether Medicaid provides reimbursements. The Medicaid reimbursements merely serve as an alternative source of funding to recoup expenses CCS is mandated to incur and provide for certain students with IEPs. These students are part of the general K-12 population.

We emphasize that under the applicable standard of review, "findings of fact by the trial court in a non-jury case are conclusive on appeal if there is evidence to support those findings." *Montague v. Montague*, __ N.C. App. __, __, 767 S.E.2d 71, 74 (2014) (citation and quotation marks omitted). "[I]t is not for an appellate court to determine *de novo* the weight and credibility to be given to evidence disclosed by the record on appeal." *Coble*, 300 N.C. at 712-13, 268 S.E.2d at 189.

The trial court's findings of fact regarding Medicaid reimbursement funds indicate the funds originated from the federal government as the donor. The trial court also found these funds were used by CCS to provide services for students with IEPs in the general K-12 population, in accordance with federal law. The transcript and evidence clearly show the donor of the funds did not designate or restrict the funds for a specific purpose. Competent evidence supports the trial court's findings of fact.

These findings of fact support the trial court's conclusion of law that the Medicaid reimbursement funds were not restricted based on their origin, purpose, or

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

### D. E-Rate

Defendant argues the trial court erred by concluding E-Rate funds were not restricted. We disagree.

The trial court's finding of fact regarding the E-Rate funds stated:

> 29.    During 2009-10, CCS used moneys designated in its audit as "E-Rate — Other Unrestricted" to reimburse other moneys paid out of its current expense fund for internet and telecommunications. CCS received the "E-Rate" reimbursement funds for operating federal programs. The evidence shows that CCS used moneys from its general fund to pay for CCS's telephones, internet, and telecommunications. Providing internet, telephones, and telecommunication services to school buildings is a utility cost and part of the operating expenses of CCS's general educational program, and such money is not used for any special program. The federal government does not restrict the use of the reimbursement funds once received by CCS.

Testimony regarding the origin, purpose, and use of the E-Rate funds tended to show the following: Dr. Cheryl Lutz ("Dr. Lutz"), the director of technology services for CCS, testified E-Rate is a federal program, which reimburses the school system for a percentage of what it pays for telecommunications and Internet access. The amount of federal reimbursement is calculated based on the school system's free and reduced lunch numbers from across the general K-12 population.

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

According to Dr. Lutz, CCS contracts with and pays a vendor for Internet and telecommunications services. CCS is reimbursed by the federal government under the E-Rate program for a portion of the money previously expended for Internet and telecommunications services. CCS is required to apply and be approved for the E-Rate program, before it purchases the services and must submit a reimbursement form.

CCS funds these services from its local current expense fund prior to reimbursement from the E-rate program. All CCS K-12 students, staff, faculty, and bus drivers may utilize the Internet and telecommunications services. The transcript and evidence clearly show the donor of these funds did not designate or restrict these funds for some specific purpose.

The trial court's findings of fact regarding the E-Rate funds indicate the federal government was the origin of these funds. The trial court also found the E-rate funds were used for Internet and telecommunications services for all CCS K-12 students, staff, faculty, and bus drivers.

The trial court's findings of fact are supported by competent evidence. These findings of fact support the trial court's conclusion that the E-Rate funds were not restricted based on the origin, purpose, and use of the moneys. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

### E. Juvenile Crime Prevention Council

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Defendant argues the trial court erred by concluding the Juvenile Crime Prevention Council ("JCPC") funds were not restricted. We disagree.

The trial court's finding of fact regarding the JCPC funds states:

> 33. CCS included moneys designated as "JCPC" in its Special Revenue Fund during fiscal year 2009-10 to hire and pay for three school counselors. CCS received this federal grant money to pay for the salaries and benefits of personnel that trained, managed, and supported at-risk students in grades K-12. The evidence revealed that in 2009-10, CCS chose to use the grant to offset salaries and benefits for two school counselors, and to combine this grant with another federal grant, Governor's Crime Commission, to offset the compensation of another school counselor. These counselors served students in CCS's general K-12 population and were therefore part of its general program. The provision of hiring and paying the salaries and benefits of school counselors for students in grades K-12 is a part of CCS's current operating expenses.

Testimony regarding the origin, purpose, and use of the JCPC funds tended to show the following: Rodney Borders ("Mr. Borders") served as the director of alternative programs for CCS during the 2009-2010 school year. Mr. Borders explained CCS sets up an alternative program for students who are "at risk as far as attendance, discipline problems, hardships in the lives, that need a smaller environment." Mr. Borders testified the alternative programs are funded by JCPC moneys, which are obtained through a federal grant.

Mr. Borders explained the JCPC funds were combined with another grant from the Governor's Crime Commission to hire and pay the salaries and benefits of

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

additional life skills counselors. Mr. Borders testified the JCPC funds were also used to pay the salaries of life skills counselors currently employed by CCS. The life skills counselors were available to all K-12 students in Cleveland County schools.

The trial court's findings of fact regarding the JCPC funds indicates the origin of the funds was from the federal government. The JCPC funds were used to pay the salaries of life skills counselors. These life skills counselors were available to the entire K-12 population of CCS.

The trial court's findings of fact regarding the JCPC funds are supported by competent evidence. These findings of fact support the trial court's conclusion that the JCPC funds were not restricted based on origin, purpose, and use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

### F. Dropout Prevention Grant

Defendant argues the trial court erred by concluding funds designated as the Dropout Prevention Grant were not restricted. We disagree.

The trial court's finding of fact regarding the Dropout Prevention Grant states:

> 35. CCS included moneys designated as "Dropout Prevention Grant" in its Special Revenue Fund during fiscal year 2009-10. CCS received this state funded grant for purposes of providing a dropout prevention program as part of its general K-12 educational programs and school curriculum. The evidence revealed that CCS was given discretion in deciding how to spend the funds received from the Dropout Prevention Grant. For the 2009-10 fiscal year, CCS decided to spend the funds to purchase computer

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

> software programs and general K-12 curriculum programs, to pay for the salaries and benefits of three CCS employees, specifically two teaching assistants and a truancy court coordinator for CCS, and to provide staff development for school counselors. Those employees were each employed by CCS in its general K-12 program.

Testimony regarding the origin, purpose, and use of the Dropout Prevention Grant tended to show: Tony Fogelman ("Mr. Fogelman"), the career and technical education director for CCS, oversaw the Dropout Prevention Grant. He explained the Dropout Prevention Grant was a "state-funded grant that provides resources to public school systems, for them to make the decision as to how they want to best spend their money to prevent dropouts, keep kids in school."

Mr. Fogelman testified the Dropout Prevention Grant was targeted at all CCS students. For the 2009-2010 school year, CSS used the Dropout Prevention Grant to pay for two teaching assistants and a truancy court coordinator.

The trial court's findings of fact regarding the Dropout Prevention Grant indicate the origin of these funds was from North Carolina state government. The transcript and evidence clearly show the Dropout Prevention Grant was intended to benefit the entire K-12 student population. CCS exercised discretion over how to spend the funds, in furtherance of its goal of preventing students from dropping out of school.

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

The trial court's finding of fact regarding the Dropout Prevention Grant is supported by competent evidence. The findings of fact support the trial court's conclusion that the funds designated for the Dropout Prevention Grant were not restricted based on origin, purpose, or use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

### G. ROTC

Defendant argues the trial court erred by concluding the Reserved Officers' Training Corps ("ROTC") funds were not restricted. We disagree.

The trial court's findings of fact regarding the ROTC funds state:

> 44. CCS included moneys designated as "ROTC" in its Special Revenue Fund during fiscal year 2009-10 to reimburse the salaries of its high school teachers teaching reserve officers' training corps courses ("ROTC"). CCS offers ROTC courses to high school students as part of its general high school program and regular high school curriculum.
>
> 45. CCS received ROTC moneys from the federal government in connection with its operation of federal programs. During 2009-10, CCS used other moneys from its general fund to pay for the salaries and benefits of its ROTC teachers in the K-12 population, and the federal government provided a reimbursement to CCS for such expenditures. The federal government places no restriction on the use of the reimbursement funds once received by CCS.

Evidence regarding the origin, purpose, and use of the ROTC funds tended to show the following: Mr. Lee testified the ROTC funds are reimbursed by the United

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

States Armed Services for partial payment of ROTC instructors' salaries. The instructors' salaries are initially paid out of the current expense fund. CCS is subsequently partially reimbursed by the federal government. Mr. Lee testified the ROTC funds were included in the current expense fund prior to the 2009-2010 school year.

The trial court's findings of fact indicate the origin of the ROTC funds was from the federal government. These funds were used to reimburse ROTC instructors' salaries paid from CCS's current expense fund. The transcript and evidence clearly show the federal government did not restrict the ROTC funds to a specific purpose.

Competent evidence supports the trial court's finding of fact that "[t]he federal government places no restriction on the use of the reimbursement funds once received by CCS." These findings of fact support the trial court's conclusion that the ROTC funds were not restricted based on origin, purpose, or use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

### H. WorkForce Investment Act

Defendant argues the trial court erred in concluding WorkForce Investment Act ("WIA") funds were not restricted. We disagree.

The trial court's findings of fact regarding WIA funds state:

> 52.    During 2009-10, CCS used moneys designated in its audit as "WIA," meaning WorkForce Investment Act, to support, prepare, and train students to enter the workforce

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

upon graduation from high school. The provision of preparing and training high school students for the workforce is part of CCS's general educational program and its regular curriculum.

53. CCS received the WIA funds as a federal grant through Isothermal Community College, which distributes moneys under the WorkForce Investment Act program to school systems within the state. The evidence reveals that CCS had discretion in deciding how to spend this grant for training students to enter the workforce upon graduation. In 2009-10, CCS chose to use this grant to offset the salaries of two employees to work at CCS's Job Link Center and to pay the hourly wages of students that were placed in the workforce through the program.

Testimony regarding the origin, purpose, and use of the WIA funds tended to show the following: Mr. Lee testified WIA is a program administered by the Isothermal Community College to transition CCS students into the workforce. Mr. Fogelman testified he was responsible for overseeing WIA money.

Mr. Fogelman stated WIA is a federal program through which the federal government distributes money to the states. He explained the states allocate this money in the form of block grants to school systems through workforce development boards.

Mr. Fogelman testified CCS submitted a grant application to the workforce development board, in which it requested a certain amount of WIA funds. CCS largely spent the money it received to pay the salaries of students who were working for various employers through the program. WIA funds were also used to pay two

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

employees who worked at the Job Link Center, which assists students in finding employment.

Mr. Fogelman stated WIA funds were primarily used to serve the general K-12 population of CCS, because the program is open to every age-eligible student. He testified every student in the school, who qualified, could participate in the program.

The trial court's findings of fact regarding WIA funds indicate the funds originated from the federal government and were allocated throughout North Carolina. WIA funds were used to pay two employees at the Job Link Center and to pay the salaries of those students who participated in the program.

Competent evidence supports the trial court's findings of facts regarding WIA funds. These findings of fact support the trial court's conclusion that WIA funds were not restricted based on the origin, purpose, and use of these funds. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

## I. Gear Up Grant

Defendant argues the trial court erred by concluding the Gear Up Grant funds were not restricted. We disagree.

The trial court's finding of fact regarding the Gear Up Grant funds states:

> 55. CCS included moneys designated as "Gear Up Grant" in its Special Revenue Fund during fiscal year 2009-10. CCS received this grant from the University of North Carolina to support providing programs that would increase the number of students attending a post-

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

secondary educational institution. The provision of providing a program to students in grades K-12 to increase the number of students who attend college is part of CCS's general educational programs and its regular curriculum. The evidence revealed that CCS was given great discretion in deciding how to spend its general funds in order to receive reimbursement funds from the Gear Up Grant. In 2009-10, CCS used moneys from the Gear Up Grant to reimburse expenses for tutoring services CCS provided to K-12 students, to pay for the salaries and benefits of CCS personnel, and to provide after-school activities. The University of North Carolina does not restrict the use of the reimbursement funds once received by CCS.

Testimony regarding the use, origin, and source of the Gear Up Grant funds tended to show the following: Juan Cherry ("Mr. Cherry"), a Graham Elementary School counselor, served as the "Gear Up coordinator" during the 2009-2010 school year. Mr. Cherry testified Gear Up is a federal grant program designed to increase the number of students who enter and succeed in post-secondary education. CCS's Gear Up program was a part of the grant received by the state. The North Carolina Gear Up grant program was administered by the University of North Carolina. Defendant provided tutors, toured university campuses, hosted mentoring programs, and other programs to their students through the Gear Up program. These programs were aimed at achieving higher college attendance rates.

CCS initially spent money out of its current expense fund, and was reimbursed through the Gear Up Grant program on a monthly basis for the money spent on the program. CCS deposited the reimbursement money into its restricted fund. Mr.

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

Cherry testified the Gear Up Grant money was spent on the general K-12 student population, with the intention of increasing the number of CCS students who attend college.

The trial court's findings of fact regarding the Gear Up Grant funds indicate the origin of these funds was from the state government to the University of North Carolina. These funds were spent on various programs aimed at achieving higher college attendance rates among CCS students. The programs were made available to the general K-12 population of CCS.

Competent evidence supports the trial court's finding of fact that "[t]he University of North Carolina does not restrict the use of the reimbursement funds once received by CCS." These findings of fact support the trial court's conclusion that the Gear Up Grant funds were not restricted based on origin, purpose, or use. *See Thomas Jefferson II*, __ N.C. App. at __, 763 S.E.2d at 293. This argument is overruled.

## V. Conclusion

The trial court properly concluded certain funds, discussed *supra*, were not restricted. The trial court's findings of fact regarding the origin, purpose, and use of certain funds are supported by competent evidence contained in the record and transcript.

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*Opinion of the Court*

These findings of fact support the trial court's conclusions of law that these funds were not restricted, and must be included in the per-pupil share of funding allotted to the charter schools. The order from which defendant CCS appealed is affirmed.

AFFIRMED.

Judge McCULLOUGH concurs.

Judge BRYANT concurs in part and dissents in part by separate opinion.

No. COA15-464 – *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cnty. Bd. of Educ.*

BRYANT, Judge, concurring in part and dissenting in part.

I concur in the majority opinion affirming the trial court's findings and conclusions regarding the restricted or nonrestricted nature of certain funds; however, I dissent from the majority's holding that the trial court's findings of fact and conclusions of law support its determination that "indirect costs" and "E-rate" funds are nonrestricted.

*Indirect Costs*

The majority opinion holds that the trial court did not err in finding and concluding that "indirect costs," which are a percentage of the total federal grant funding that pays for the operating expenses incurred by the school system to implement federally funded grant programs, are nonrestricted revenues. I respectfully disagree with this holding. This Court has noted that " 'federal grants restricted as to use' . . . clearly have operating expenses . . . but that fact does not make the funds 'unrestricted.' " *Thomas Jefferson et al. v. Cleveland Cnty. Bd. of Educ.*, \_\_\_ N.C. App. \_\_\_, \_\_\_, 763 S.E.2d 288, 293 (2014) ("*Thomas Jefferson II*") (instructing the trial court on remand to determine whether funds are restricted). The trial court specifically found that CCS received indirect costs "in connection with its operation of federal programs." Because the *origin* of revenue for indirect costs was the federal grants themselves, and because the federal grant money was

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*BRYANT, J., concurring in part and dissenting in part*

restricted to specific purposes, the funding for operating expenses incurred in connection with those grants is likewise restricted.

Additionally, even though the trial court found that "[t]he federal government [did] not place any restrictions on how CCS *uses* the reimbursements it received for indirect costs," it nonetheless acknowledges those funds are received in connection with CCS's operation of federal programs. *See id.* ("[W]e define 'restricted' funds as those funds which have been designated by the donor for some specific program or purpose . . . .").

Finally, the majority opinion focuses quite a bit on Mr. Lee's testimony. With regard to his testimony, it is notable that the trial court found that indirect costs "consisted of reimbursements from the federal government," when Mr. Lee testified exactly to the contrary. He testified that indirect costs "are not reimbursements at all. They are in fact a part of the full [federal] grant." It is unclear from the record that there is evidence to support this finding of fact by the trial court. Further, the findings by the trial court confirm that the origin and purpose of the indirect costs were restricted. Here, the trial court found that "CCS received [the indirect costs] in connection with its operation of federal programs," whose funds were restricted. To then say that the government placed no restriction on the use of those funds is not supported by the record, and further, violates the mandate of the Court in *Thomas Jefferson II* as to the definition of "restricted" funds. *See id.* For these reasons, I

2

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*BRYANT, J., concurring in part and dissenting in part*

disagree with the majority opinion regarding indirect costs, and would hold that the indirect costs are restricted funds.

### E-Rate

The majority opinion also holds that the trial court did not err in finding and concluding that E-Rate funding was made available by the federal government for unrestricted *use* for the entire K–12 population and was not *used* for any special program. Again, I disagree.

The majority opinion, as did the trial court, disregards the origin of the E-Rate funds. The trial court's findings are insufficient to support its conclusion that the E-Rate funds are not restricted. The trial court, in defiance of the mandate of *Thomas Jefferson II*, made conclusory findings as to use, but failed to make findings concerning the funds' origin and purpose. While it is true that all CCS students, staff, and even bus drivers could use the Internet and telecommunications services provided for by the E-Rate funds, the funds were essentially restricted because of the nature of the strict application and approval process, which goes towards the funds' "origin and purpose." *See id.* at ___, 763 S.E.2d at 294 (instructing the trial court on remand to determine whether funds are restricted by examining and making findings of fact about the *origins*, purpose, and uses of the challenged funds). Evidence in the record shows that the funds originated from the federal government for very specific technological purposes and that the funds were used for those specific purposes.

3

THOMAS JEFFERSON CLASSICAL ACAD. CHARTER SCH. V. CLEVELAND CNTY. BD. OF EDUC.

*BRYANT, J., concurring in part and dissenting in part*

Specifically, E-Rate funds are made available to reimburse a school only after certain pre-approved purchases are made.  CCS was required to obtain approval for the purchase of qualified technology services in advance and only then could the school system purchase the service.  Once CCS purchased the pre-approved telecommunications and internet access, the school system was eligible to submit an application for reimbursement at a set rate.

E-Rate funding was not made available by the federal government for unrestricted use for the entire K–12 population.  Rather, the E-Rate funds were provided by the federal government for a specific purpose.  Therefore, the trial court's finding of fact which includes the statement that "[t]he federal government does not restrict the use of the reimbursement funds once received by CCS," is not supported by the evidence.  To the contrary, the evidence established that E-rate funds would never have been provided to defendant but for its compliance with the federal government's lengthy and detailed approval process to ensure that only qualified technology services were purchased.

Despite who ultimately benefited from the *use* of the technology, the *funds* were restricted in that pre-approval was required and the funds were used for their specified purpose.  Accordingly, I would reverse the trial court and find that the E-rate funds were restricted by the donor—the federal government—and required to be used for a specific purpose.